IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EDWARD A. MOORE, JR., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 12 C 8325 |
| MARCUS HARDY, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On June 9, 1992, petitioner Edward A. Moore was convicted of first degree murder, home invasion, residential burglary, aggravated criminal sexual assault, robbery, and arson. The jury sentenced him to death on June 10, 1992, although his sentence was later commuted to life imprisonment.

Moore filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 on October 17, 2012 (Dkt. No. 1), and the State of Illinois filed an answer on January 17, 2013 (Dkt. No. 13). On February 25, 2013, the court extended the time for Moore to file his reply until April 22, 2013. Moore has not filed a reply as of April 29, 2013. Nonetheless, Moore has filed several affidavits and letters in the record related in part to the merits of his petition. (Dkt. Nos. 16, 17, 18, 19, 22.) The court has considered all of those filings as part of Moore's reply. For the reasons explained below, the § 2254 petition of petitioner Edward A. Moore, Jr. (Dkt. No. 1) is denied.

BACKGROUND

The following factual summary was set forth by the Illinois Supreme Court in Moore's direct appeal:

The charges against [Moore] stem from the sexual assault and murder of Judy Zeman on July 7, 1991. At trial, Dennis Hackett testified that he reported to the Grundy County sheriff's department an abandoned car in his front yard on July 7, 1991. Deputy Lonnie Harvey testified that he responded to the call at 5:22 a.m. and discovered a Cadillac car against a tree with its keys in the ignition and its engine running. Harvey determined that the car was registered to the Zemans, who lived nearby, and drove to their home. As Harvey neared the Zeman home, he noticed a large woodpile burning and a burn victim lying just east of the attached garage on the horseshoe driveway. The victim was unclothed, had burns over most of her body, had a "circular halo clump of duct tape" stuck in her hair, was lying on her back with her hands tied underneath her by duct tape, and was moaning for help. The victim identified herself as Judy Zeman and told Harvey that a man "raped [her] and lit [her] on fire." She pleaded with Harvey to untie her hands and told him that she was cold. After Harvey cut the duct tape binding her hands and covered her with a blanket, he "asked [the victim] if she knew who had done this to her, and she said no she didn't." Harvey testified that he never asked for a facial description and the victim did not volunteer one.

While awaiting the ambulance, the victim told Harvey that she had been asleep in her bedroom with her dog, who began barking at about 2:30 a.m. After awhile, she opened the bedroom door to let the dog out, and walked to the bathroom when a man jumped out with a knife. The victim related that it was extremely dark and that all she could tell about the man was that he wore black tennis shoes, dark clothes, and gloves. She said that the man raped her in her bedroom, stole money and jewelry, and took her outside to the woodpile, which was located to the southeast of the horseshoe driveway. The man told her that he had to burn some evidence. He then poured gasoline on her and lit her on fire. She later crawled from the woodpile to the driveway. She added that the man kept calling her a bitch. The victim told Harvey that her husband was in Alaska on a fishing trip. When Harvey told the victim that her car was found, she responded that she thought the man was going to sell the car. A paramedic testified that the victim told her that she had been lying on the driveway since 3 or 3:30 a.m.

The victim was admitted to Morris Hospital's emergency room at 6:16 a.m. on July 7. The physician testified that he believed the victim sustained second- and third-degree burns over 90% of her body and was conscious but in shock. At 6:31 a.m., the victim was intubated, rendering her unable to speak. In fact, the victim was never able to speak again.

In the brief 15 minutes between her hospital admission and intubation, the victim spoke with various medical personnel on duty. Debbie Esler, a cardiopulmonary technician, testified that she asked the victim if she had ever seen

2

the man who did this to her before and that the victim said "no." Patty Orton-Williamson, a nurse, testified that she heard the victim tell Esler either that she did not see the man or that she did not know the man.

Medical personnel also testified to other information. Esler testified that the victim told her that the man tried to tie her to the back of her car and that he beat her. Terry Donahue, an anesthetist, testified that the victim told him that the man started her car and told her to kneel behind the exhaust pipe, but she refused. Donahue and Esler also testified that a strip across the victim's eyes did not appear to be as burned as the rest of her face. Donahue testified that this strip was consistent with the size of the duct tape stuck in the victim's hair. Esler testified that she believed the duct tape stuck in the victim's hair, which, according to other witnesses gave the appearance of a halo, had once covered the victim's eyes and had later been pushed up.

The victim was transferred from Morris Hospital to another hospital that morning. She remained intubated and thus unable to speak. The victim was pronounced dead at 8:43 that evening. She died from thermal burns. The medical examiner who performed the autopsy testified that the victim also had a bruise on her vaginal wall consistent with sexual assault, head injuries caused by blunt trauma, and a tongue laceration consistent with being struck on the jaw. The medical examiner further testified that some of the victim's eyelashes, some of her right eyebrow, and a little of her left eyebrow were still intact.

The Grundy County sheriff's department investigated the murder. The sheriff testified that, because the Zeman house was newly built and secluded, he told officers to interview those who had worked on the house, including [Moore]. The sheriff testified that the officers could not find [Moore], who, they later learned, had flown to Florida on July 7.

A deputy testified that on July 7 he found a business card in the driveway of the Bruce Barr residence, a new home being built next door to the home where the victim's car had been abandoned. The business card was pink and had printed on it "E & M Painting" and "Ed Moore." A detective testified that Barr told him that he did not see [Moore]'s business card on the driveway when he left the construction site at 5 p.m. on July 6. Barr testified that [Moore] had visited the site several times within weeks of the murder to solicit work, but that he did not give Barr a business card. Pursuant to a search warrant issued on July 15, 1991, a detective seized three of the same business cards from the floorboard of [Moore]'s car and a box of the same from [Moore]'s apartment. A print shop owner identified the box of business cards, and testified that it left his shop on June 26, 1991.

3

The sheriff's department interviewed Carl Zeman, the victim's husband. Carl testified at trial that he and his wife moved into the unfinished home in December 1990. Carl stated that [Moore] painted the interior of their home from mid-April to June 1991. During this time, [Moore] spent time alone in the house and befriended the family dog. Carl testified that he had paid [Moore] in cash from a safe located in a master bedroom closet on occasion. He said that he and his wife were the only ones who knew the safe's combination.

Carl left for an Alaska fishing trip on July 2, 1991, and was scheduled to return on July 8, 1991. Carl testified that he had planned this trip months in advance and had mentioned it in [Moore]'s presence. When Carl left for the trip, the safe contained between $7,000 and $10,000, some of his wife's jewelry, and other legal papers. When he returned, the safe was empty. Also missing were his wife's car and a gasoline can from the garage. According to Carl, [Moore] never had permission to use his wife's car. He further testified that [Moore] had access to a house key that opened every door to the house except the patio door. A crime scene technician testified that the patio door was the point of forcible entry to the home.

During their investigation, the sheriff's department subpoenaed telephone records. An Illinois Bell security manager testified at trial that, at 9:07 p.m. on July 6, a 10-minute telephone call was placed from [Moore]'s home phone number to the Zemans' home phone number.

Several witnesses testified regarding [Moore]'s financial status before the time of the murder. An operations officer of a bank testified that [Moore]'s checking account was closed on April 19, 1991, because of overdrafts. An officer of another bank testified that [Moore]'s checking account was closed on May 8, 1991, because of overdrafts.

An Illinois state police sergeant testified that he searched the home of [Moore]'s girlfriend pursuant to a warrant on July 20, 1991, and found two money orders dated July 9, 1991. Each money order was made payable to the girlfriend in the amount of $700. The remitter listed was Ken Moore.

Numerous witnesses testified regarding [Moore]'s whereabouts on July 6 and 7, 1991. A restaurant owner in Westmont testified that [Moore] arrived at his restaurant/bar around 3 p.m. on July 6 and left around dusk. [Moore]'s apartment building manager testified that she talked with [Moore] in her apartment briefly on July 6 between 8 and 9 p.m. As stated, at 9:07 p.m. on July 6, a 10-minute phone call was placed from [Moore]'s phone number to the Zemans' phone number. Sometime between 10 p.m. and midnight on July 6, [Moore] left a message on a customer's answering machine, in which he apologized for missing their July 6

4

appointment and said he would stop by on July 7. The customer never heard from [Moore] again. Two witnesses testified that [Moore] was at a bar on July 6, and one of the two witnesses testified that [Moore] stayed until at least 12:50 a.m. on July 7. A friend of [Moore]'s next-door neighbor testified that while he was at his friend's apartment briefly at around 1 a.m. on July 7, [Moore] came over and asked for a beer.

No testimony established where [Moore] was while the victim was being attacked, which, according to testimony, was sometime between 2:30 and 3:30 a.m. on July 7. At 6:30 a.m. on July 7, flight reservations were made by phone for Ken and Cathy Peterson. The flight was to leave Chicago and arrive in Florida on July 7. A sales agent identified [Moore] at trial as the person who came to her ticket counter to purchase one of these tickets. Because he was paying in cash, had no baggage, and was purchasing a one-way ticket, the agent requested identification. Initially [Moore] said he had none, but he later confessed that his name was Ed Moore, not Ken Peterson, and displayed his Illinois driver's license. The agent reissued a ticket for the Florida flight in the name of Ed Moore.

At trial, the victim's daughter identified her mother's pearl ring, topaz ring and diamond wedding band from photographs. These photographs were also shown to two Florida witnesses. One witness from Florida testified that [Moore] tried to sell her a diamond ring and a pearl ring in a Florida bar on July 9, 1991, and she identified the pearl ring as the victim's from a photograph. A co-worker corroborated the witness' testimony, but a Florida officer testified that the co-worker had stated earlier that he did not see [Moore] with jewelry. The co-worker added that [Moore]'s appearance had changed between July 9 and a week or two later. A second witness testified that [Moore] tried to sell her a diamond ring and a topaz ring in a Florida bar on July 20, 1991, and she identified the topaz ring as the victim's from a photograph. The second witness admitted that she saw a poster offering $40,000 for information leading to [Moore]'s conviction, but testified that she did not expect to receive the reward. She added that [Moore] kept calling her a bitch.

Several witnesses testified that [Moore] acted suspiciously while in Florida. In July 1991, a Pinellas County detective placed a motel guest registered as Ken Pontello under surveillance. After the investigation was closed, the detective learned that Ken Pontello was [Moore]. During surveillance, [Moore] was interviewed twice. A Florida officer testified that on July 23, he approached [Moore] at a pay phone. The officer searched a bag that was sitting at the base of the phone, and found clothing and $965 in cash. [Moore] identified himself as Ken Pontello and displayed an Arizona driver's license, but was unable to correctly state his social security number. The officer also inquired about a bandage on [Moore]'s

5

right forearm. While [Moore] gave medical excuses for it, the officer determined that the bandage covered a tattoo like one on [Moore]'s right forearm. In the second interview on July 24, [Moore] identified himself to a detective as Keith Moore, and could not explain why he was registered as Ken Pontello. [Moore] stated that he was from Phoenix, but gave a fictitious address. [Moore] possessed some clothing and a check in the amount of $1,000 or $2,000.

A cab driver in Florida knew [Moore] as Tom. The cab driver testified that on July 23 he booked a room for [Moore] under his name because [Moore] said he had no identification. He added that [Moore]'s appearance had changed since several weeks before July 23. The cab driver also admitted that he had heard about a reward.

A friend of [Moore] who lives in Florida testified at trial that [Moore] called the friend, and told the friend that he needed $5,000 in money orders "laundered" through the friend's mother and some cash to tide him over. In cooperation with a Federal agent, the friend sent [Moore] $100 payable to Ken Saif through Western Union on July 27, and learned later that day that the money had been picked up at a bus terminal in New York City. The friend added that [Moore] calls anyone a bitch when agitated. A Kankakee police officer testified that the friend's mother received three money orders in a Federal Express envelope.

A New York City detective testified that on July 27, a Grundy County deputy called and told him that a murder suspect wanted in Illinois had just picked up $100 from a western union located in his precinct. [Moore] was arrested later that day by New York City officers. When arrested, [Moore] had in his hand a cut up identification card in the name of Ken Saif. [Moore] was taken to a New York City police station and placed in a holding cell.

Testimony was introduced at trial regarding inculpatory statements made by [Moore] while in the holding cell with Irwin Johnson and Troy Snell. Johnson testified that [Moore] told him and Snell that he was being held in connection with an Illinois murder. [Moore] explained that he was a painter for a wealthy woman with whom he was having an affair. [Moore] stated that he and the woman had sex and then argued about her husband coming home. [Moore] said that he used duct tape to cover the woman's eyes and to tie her wrists behind her. He stated that he took some of the woman's money and jewelry, and then set her on fire. Johnson admitted that he heard Snell talk about a $40,000 reward for information leading to [Moore]'s conviction when he and Snell were being transported to testify in this case. Snell testified in rebuttal that Johnson was present when Snell heard [Moore] say that the police were trying to charge him with murder, rape and robbery in Illinois, but that they had nothing on him. A New York City detective testified that

6

while he was doing paperwork, he overheard [Moore] say that "they couldn't have gotten the prints off the tape it should have burned" and "something like she couldn't have told them who it was." The detective also testified that [Moore]'s hair looked like it had been dyed.

Physical evidence was admitted at trial. A forensic scientist testified that two fingerprints on the adhesive side of the duct tape removed from the victim's hair and one fingerprint on a key tag found in the victim's abandoned car were identified as [Moore]'s. Another forensic scientist testified that seminal material taken from the victim's vaginal swab was consistent with [Moore]'s blood type. Having compared hairs found on the floor mat of [Moore]'s car to known standards, a forensic scientist testified that two hairs were consistent with the victim's head hairs, and that one hair was consistent with [Moore]'s head hairs and showed signs of extreme heat damage. He also compared hairs found on the victim's bedding and underclothing, and testified that those hairs were not consistent with [Moore]'s. The State's DNA expert testified that [Moore]'s blood and the seminal fluid taken from the victim's vaginal swab "matched," and that the probability that someone other than [Moore] was the donor was 1 in 466. [Moore]'s DNA expert testified that the FBI procedures were flawed and that the probability calculated was not significant.

[Moore] did not testify at trial. The jury found [Moore] guilty of seven counts of first degree murder, and one count each of home invasion, residential burglary, aggravated criminal sexual assault, robbery and arson. The State asked for the death penalty.[1]

*People v. Moore*, 662 N.E.2d 1215, 1219-24 (Ill. 1996). Following the conviction, Moore was

sentenced to death. *Id.* at 1224. On direct appeal to the Illinois Supreme Court, Moore raised

---

[1] The court presumes the Illinois Supreme Court's recitation of the facts to be true. 28 U.S.C. § 2254(e)(1); *Whitman v. Bartow*, 434 F.3d 968, 969 (7th Cir. 2006). Moore contends that several facts as stated by the Illinois Supreme Court are not accurate. (Dkt. No. 18, at 1-3.) He contends first that Donahue and Esler did not testify that a strip across Zeman's eyes was less burned than the rest of her face. The record reflects that they both so testified. (*See* R. at 1660:21-23, 2501:8-12.) Contrary to Moore's contentions, Esler also testified that the duct tape in Zeman's hair looked like it had been pulled up after covering her eyes. (R. at 2501:14-17.) Finally, Moore is correct that Donahue testified that the victim told him that the offender made her start the car, rather than starting the car himself, as the Illinois Supreme Court stated. (R. at 1670.) That error is immaterial, however.

twelve claims:

a) that the trial court erred in admitting evidence of the FBI's DNA testing without a *Frye* hearing;

b) that the trial court erred by admitting DNA evidence, the probative value of which was outweighed by the prejudice to Moore;

c) that the prosecution improperly argued that hair and semen, which were merely consistent with Moore, linked him to the offense;

d) that trial counsel was ineffective for failing to move to suppress evidence of burnt hairs in petitioner's truck because the warrant authorizing the search was overly broad;

e) that Moore was not proven guilty beyond a reasonable doubt;

f) that the prosecution improperly denigrated the presumption of innocence and commented on petitioner's failure to testify at trial;

g) that the trial court erroneously denied petitioner's right to have the jury instructed on jury nullification at the death-penalty eligibility stage;

h) that the prosecution introduced inadmissible hearsay during the sentencing hearing;

i) that the prosecution improperly inflamed the jury at the second stage of the capital sentencing hearing;

j) that the Illinois death-penalty statute was unconstitutional for allowing a vague aggravating factor;

k) that the Illinois death-penalty statute was unconstitutional for placing the burden of proof on a criminal defendant; and

l) that the Illinois death-penalty statute was unconstitutional for not adequately minimizing the risk of arbitrary death sentences.

(Dkt. No. 14, Ex. C.) The Illinois Supreme Court rejected those arguments and affirmed Moore's conviction and sentence. *Moore*, 662 N.E.2d at 1237-38. The U.S. Supreme Court denied Moore's petition for writ of certiorari on October 7, 1996. *Moore v. Illinois*, 519 U.S. 875 (1996).

On July 3, 1995, Moore filed a petition pursuant to the Illinois Post-Conviction Hearing Act, which the trial court dismissed on March 16, 1998. (*See* Dkt. No. 14, Ex. U.) After the dismissal, but before Moore filed his brief in his appeal, Moore obtained two affidavits from Johnson (dated July 3, 1998) and Snell (dated August 3, 1998), Moore's cellmates in New York who testified at trial that Moore had made inculpatory statements to them. (Dkt. No. 1, at 22-23 &

Ex. 3.) The affidavits stated that, contrary to the trial testimony, Moore had not shared any details

of the crime with them, nor had he confessed that he committed the crime. (Dkt. No. 1, Ex. 3.) The

affidavits also stated that Johnson and Snell had overheard the details of the crime from a detective

talking about the case in front of their cell, and that they testified against Moore to obtain the

reward offered in the case. (*Id.*)

On appeal of the dismissal of his post-conviction petition to the Illinois Supreme Court,

Moore raised five issues:

a) that he was denied due process of law because he did not receive an adequate hearing regarding his fitness for trial;
b) that his trial counsel was ineffective because he had a conflict of interest;
c) that his post-conviction counsel failed to provide a reasonable level of assistance under Illinois Supreme Court Rule 651(c) when he failed to assert adequately that trial counsel was ineffective for failing to investigate fingerprint and hair comparison evidence;
d) that the recantation by Johnson and Snell required a remand to the trial court for an evidentiary hearing to determine whether the newly discovered evidence warranted a new trial; and
e) that the Illinois Death Penalty Statute was unconstitutional.

(Dkt. No. 14, Ex. F.) The Illinois Supreme Court affirmed the dismissal of Moore's petition.

*People v. Moore*, 727 N.E.2d 348 (Ill. 2000). In particular, the court held that Moore waived the

right to an evidentiary hearing on Johnson's and Snell's affidavits by failing to raise the issue in his

post-conviction petition. *Id.* at 360. The U.S. Supreme Court again denied Moore's petition for a

writ of certiorari. *Moore v. Illinois*, 531 U.S. 930 (2000).

On February 9, 2000, Moore filed a motion for DNA testing pursuant to 725 ILCS 5/116-3,

which the trial court denied. On appeal to the state appellate court and in a petition for leave to

appeal to the Illinois Supreme Court, Moore argued a single claim: that the trial court should have

allowed DNA and fingerprint testing of certain items of evidence that had been collected since his trial. (Dkt. No. 14, Exs. J, N.) The state appellate court and the Illinois Supreme Court rejected his claim. (Dkt. No. 14, Exs. I, M.)

Moore filed a successive post-conviction petition on January 9, 2001, and the trial court dismissed the petition over several stages. (*See* Dkt. No. 14, Ex. U.) In particular, the court rejected any claim based on Johnson's and Snell's affidavits because Moore waived that claim by not raising the issue in his initial post-conviction petition. While Moore's successive post-conviction petition was pending, the Illinois governor commuted his sentence to life imprisonment. Accordingly, when Moore appealed on September 9, 2010, his appeal went to the state appellate court.[2] (*See* Dkt. No. 14, Ex. O, at 8.) Before the state appellate court, Moore raised two arguments:

a) that the appointed counsel representing him in the trial court on his second post-conviction petition failed to provide a reasonable level of assistance under Illinois Supreme Court Rule 651(c) because he failed to consolidate duplicate claims, to eliminate non-meritorious claims, amend claims, and obtain support for claims; and

b) that the trial court erred by holding that Moore had waived any argument based on the recantation by Johnson and Snell, Moore's cellmates in New York, of parts of their testimony because he failed to raise the issue before the trial court in his first post-conviction petition.

(Dkt. No. 14, Ex. P.) The state appellate court affirmed. (Dkt. No. 14, Ex. O.) The court rejected the argument that Moore's inability to obtain Johnson's and Snell's affidavits until 1998

---

[2] Prior to February 6, 2013, Illinois Supreme Court Rule 651(a) provided that all appeals from post-conviction proceedings involving a death sentence went directly to the Illinois Supreme Court, while all other appeals in post-conviction proceedings went to the designated appellate court.

constituted cause for his failure to raise the issue earlier. (*Id.* at 12-13.) The court noted that Moore failed to allege a reason for the delay in obtaining the affidavits, and concurred with the State's position that "defendant and his trial counsel would have known at the time of trial [in 1992] that Johnson and Snell perjured themselves." (*Id.* at 13.) The delay until 1998 in obtaining the affidavits was thus unjustified. (*Id.*) The court also rejected the argument that Johnson's and Snell's affidavits showed that Moore was actually innocent, on the ground that the other evidence against him was overwhelming. (*Id.* at 15.)

Moore filed a petition for leave to appeal in the Illinois Supreme Court pro se, raising seven issues:

a) that he is innocent;
b) that his successive post-conviction trial counsel failed to provide a reasonable level of assistance under Illinois Supreme Court Rule 651(c);
c) that his successive post-conviction appellate counsel failed to provide a reasonable level of assistance under Illinois Supreme Court Rule 651(c) by failing sufficiently to raise the argument that Johnson had recanted his testimony;
d) that the Florida witnesses were paid for their testimony from reward money offered by the victim's family;
e) that his trial counsel was ineffective because he did not obtain a fingerprint expert to contest the State's evidence;
f) that the State failed to turn over DNA evidence found on the victims sheets and in blood under her fingernails, and failed to allow Moore to perform DNA testing on this evidence; and
g) that the victim had said before dying that she did not know her assailant.

(Dkt. No. 14, Ex. T.) The Illinois Supreme Court denied the petition on September 26, 2012. (Dkt. No. 14, Ex. S.) On October 17, 2012, Moore filed the § 2254 petition currently before this court.

## ANALYSIS

Moore's habeas petition raises thirty-two claims for relief (some of which are redundant), as follows:

11

1) a State witness had improper contact with jurors during a breakfast at the hotel where they were staying;

2) the State failed to disclose that certain witnesses received reward money in exchange for their testimony;

3) the State failed to disclose police interview notes that further corroborated that the victim said she did not know her murderer;

4) the State failed to disclose (1) lab report notes that raise doubts over whether Moore's heat-damaged hair was found on the floor mat of his car, and (2) witness interview notes;

5) the State has latent physical evidence, including fingerprints, hairs, and semen stains, that could demonstrate Moore's innocence, but failed to allow post-conviction forensic testing of that evidence under 725 ILCS 5/116-3;

6) the State presented perjured testimony, including from New York prison witnesses Snell and Johnson, Florida witness Hopkins, and a New York deputy;

7) the State used testimony regarding fingerprints that was not scientifically sound;

8) the State told witnesses they would receive reward money for their testimony and did not disclose that fact to Moore;

9) Moore's trial counsel had a conflict of interest because he was paid by Moore's girlfriend and had connections with her attorney;

10) trial counsel was ineffective for failing to investigate another suspect after Ronald Rittenhouse, an inmate at the Will County jail, informed police officers that a friend had related to him that another acquaintance may have been involved in the murder;

11) trial counsel was ineffective for failing to retain fingerprint and hair experts;

12) trial counsel was ineffective for failing to investigate witnesses who would have testified that Moore's trip to Florida was preplanned;

13) trial counsel was ineffective for failing to object to hearsay testimony presented at sentencing by police Chief Terry Marketti that Moore threatened a Grundy County Sheriff Deputy, and for failing to present evidence rebutting that testimony;

14) the State presented perjured testimony regarding the victim's stolen jewelry;

15) the State presented perjured testimony of a hair expert;

16) trial counsel was ineffective for failing to seek suppression of burnt-hair evidence, and post-conviction appellate counsel was ineffective for failing to raise the claim;

17) the State presented perjured testimony of Kathy Domanico, one of the Florida witnesses, and failed to disclose hand-written police interview notes revealing discrepancies in Domanico's testimony;

18) post-conviction appellate counsel was ineffective for failing to raise the claim that witness Irwin Johnson expected he would receive reward money in exchange for his testimony;

19) trial counsel was ineffective for failing to secure a DNA expert for the DNA evidentiary hearing;

20) post-conviction appellate counsel was ineffective for failing to preserve Moore's claims of ineffective assistance of trial counsel;

21) the State failed to disclose notes from interviews of Rittenhouse, who claimed to have received details regarding the murder from an alternate suspect;

22) a State witness had improper contact with jurors during a breakfast at the hotel where they were staying;

23) the trial court erred by not holding a *Frye* hearing regarding the admission of the FBI's DNA evidence;

24) the Illinois Supreme Court erred by applying the fitness standard of *People v. Mitchell*, 727 N.E.2d 254 (Ill. 2000), which was issued while Moore's appeal was pending;

25) trial counsel was ineffective for failing to object to hearsay testimony presented at sentencing by police Chief Terry Marketti that Moore assaulted two correctional officers while incarcerated in New York, and for failing to present evidence rebutting that testimony;

26) appellate counsel was ineffective for failing to argue on direct appeal that the prosecutor improperly argued facts not in evidence, and that the attacker might have worn a mask and wiped fingerprints off the murder weapon;

27) the State improperly argued that hair and semen linked Moore to the crime, denigrated the presumption of innocence, and commented on Moore's failure to testify through statements about "uncontradicted" testimony;

28) the trial court erred in denying his post-conviction request for DNA testing pursuant to 725 ILCS 5/116-3;

29) a State witness had improper contact with jurors during a breakfast at the hotel where they were staying;

30) post-conviction counsel did not provide "reasonable" assistance because he failed, after his appointment, to amend Moore's claims;

31) the trial court erred in dismissing Moore's successive post-conviction petition on the ground that Moore forfeited his witness recantation argument by not raising it in his previous post-conviction petition; and

32) post-conviction counsel did not provide "reasonable" assistance because he failed, after his appointment, to amend the claims Moore presented pro se.

(Dkt. No. 1.)

I.     Procedural Default

Before the court can properly consider any of those claims, however, it must determine whether they are properly presented for review. Section 2254 requires that a habeas petition not be granted unless the petitioner first exhausts the remedies available in the state court system. 28

13

U.S.C. § 2254(b)(1)(A). To exhaust his state remedies, "the petitioner must assert his federal claim through one complete round of state-court review, either on direct appeal or in post-conviction proceedings." *Pole v. Randolph*, 570 F.3d 922, 934 (7th Cir. 2009). To satisfy that requirement, the petitioner must also present his claims in a petition for discretionary review to the Illinois Supreme Court, if available. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *White v. Godinez*, 192 F.3d 607 (7th Cir. 1999). With respect to Moore's claims, only claims 16, 23, 24, and 27 were presented to the Illinois Supreme Court on direct review. Only claims 6 (with respect to Snell and Johnson), 9, 20, and 24 were presented to the Illinois Supreme Court on review of Moore's initial post-conviction petition. Claims 5 and 28 were presented to the Illinois Appellate Court and the Illinois Supreme Court upon review of the denial of Moore's motion for DNA testing pursuant to 725 ILCS 5/116-3. Finally, only claims 30 and 32 were presented to both the Illinois Appellate Court and the Illinois Supreme Court on review of Moore's successive post-conviction petition. Accordingly, only claims 5, 6 (with respect to Snell and Johnson), 9, 16, 20, 23, 24, 27, 28, 30, and 32 have been properly exhausted in state court. Moore has failed to exhaust all of his other claims, which are therefore procedurally defaulted under § 2254.

In addition, a federal court need not review claims that the state court rejected because of an independent and adequate state law procedural ground, for "'[a] state is entitled to treat as forfeited a proposition that was not presented in the right court, in the right way, and at the right time—as state rules define those courts, ways, and times.'" *Johnson v. Loftus*, 518 F.3d 453, 458 (7th Cir. 2008) (quoting *Szabo v. Walls*, 313 F.3d 392, 395 (2002)). Waiver and forfeiture are independent and adequate state law procedural grounds. *Sturgeon v. Chandler*, 552 F.3d 604, 611

14

(7th Cir. 2009) ("A finding of waiver by the state postconviction court is enough to establish an adequate and independent state ground."); *see also Smith v. McKee*, 598 F.3d 374, 383 (7th Cir. 2010) (forfeiture).

Thus, for example, the claims that Moore presented to the Illinois Supreme Court on review of his successive post-conviction petition, but that he had not presented to the Illinois Appellate Court below (claims 2, 8, and 11), were waived at the state level. They are thus not eligible for review under § 2254, even overlooking that they have not been properly exhausted.

Among the claims that Moore exhausted in state court, claim 6—that the State presented perjured testimony that Snell and Johnson later recanted—was dismissed by the Illinois Supreme Court because it was raised for the first time on appeal.[3] *Moore*, 727 N.E.2d at 360 ("Because this issue was not raised in defendant's post-conviction petition, it is waived . . . and we do not consider it in this appeal." (citation omitted)). Similarly, the Illinois Supreme Court found that much of claim 27's argument that the State engaged in improper closing argument was waived because Moore failed to object to the improper argument at trial.[4] *Moore*, 662 N.E.2d at 1226 ("We first point out that the defendant failed to object to these challenged remarks at trial, and he has thus waived the issues for review."); *id.* at 1228 ("Defendant, however, failed to object to these

---

[3] Moore also raised claim 6 in his successive post-conviction petition and in his appeal of that petition to the state appellate court. (*See* Dkt. No. 14, Ex. P.) The state appellate court held that the argument was barred by res judicata and waiver (Dkt. No. 14, Ex. O, at 12-13), providing an additional independent and adequate state law procedural ground precluding review in this court.

[4] Claim 27's contention that the state improperly commented on Moore's failure to testify by discussing "uncontradicted" testimony is preserved and addressed below. *See Moore*, 662 N.E.2d at 1229-30.

15

comments at trial, and he thus waived the issues."). The Illinois Supreme Court proceeded to evaluate the waived arguments in claim 27 under plain error review. That limited review, however, is inadequate to avoid procedural default. *See Gray v. Hardy*, 598 F.3d 324, 329 (7th Cir. 2010) ("[W]e have repeatedly explained that where a state court reviews the claim for plain error as the result of a state procedural bar such as the Illinois doctrine of waiver, that limited review does not constitute a decision on the merits."). Claim 6 (with respect to Snell and Johnson) and much of claim 27 were thus rejected on independent and adequate state law procedural grounds, so the court need not consider those claims.[5]

## II.     The Defaults are not Excused

Moore has therefore procedurally defaulted all of his claims except claims 5, 9, 16, 20, 23, 24, 27 (with respect to Moore's argument that the State's argument violated the presumption of innocence), 28, 30, and 32. Nonetheless, the court may still consider the defaulted claims "if he can establish cause and prejudice for the default or that the failure to consider the claim would result in a fundamental miscarriage of justice." *Crockett v. Hulick*, 542 F.3d 1183, 1193 (7th Cir. 2008). Moore does not explicitly argue that he meets either of those exceptions. One of his filings with the court does, however, include the following paragraph:

---

[5] The State contends that claim 23 is also procedurally defaulted because the Illinois Supreme Court stated that it was "arguably waived" before rejecting it on the merits. *Moore*, 662 N.E.2d at 1226. That statement is not sufficiently clear to indicate that the Illinois Supreme Court's decision rested on an independent and adequate state law ground. *See Jenkins v. Nelson*, 157 F.3d 485, 491 (7th Cir. 1998) (finding no default when state appellate court opinion discussed both procedural bar and merits, but the opinion "does not include an express statement detailing its reliance on procedural default, nor does it state that the court is reaching the merits of Jenkins' claim only in the alternative").

> In my 1st post-conviction petition, I let the Illinois Supreme Court know in motions that my Appellate Counsel was not preserving all my claims for Federal review in a Hab[eas] in my successive post conviction [petition.] I had also in motions, let the circuit court know my counsel was not preserving all my claims for Fed[eral] Hab[eas] review. In my successive post-conviction petition, my Appellate Counsel had told me all my claims were preserved in that Petition and on 9-26-12 the Illinois Supreme Court had denied my PLA. I believe I made a good record in the state courts.

(Dkt. No. 18, at 3-4.) In a subsequent filing, Moore also stated that "[h]e knows of none of [his] claims to be defaulted and if any should be, then counsel who represented [him] at whatever stage is ineffective." (Dkt. No. 22, at 3.)

Read charitably, those statements raise the argument that the ineffectiveness of post-conviction counsel can constitute "cause" sufficient to satisfy the first part of the cause and prejudice test. The court will therefore address that argument. The general rule is that "an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default." *Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012) (citing *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991)). In *Martinez*, however, the Supreme Court recognized a narrow exception to that general rule providing that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* Significantly,

> this "narrow exception" only applies in states "[w]here . . . the initial-review collateral proceeding is the first designated proceeding for a prisoner to raise a claim of ineffective assistance at trial." Cause may be established in such cases either, (1) where the state courts failed to appoint counsel for the initial-review collateral proceeding, or (2) where appointed counsel at the initial-review collateral proceeding was ineffective according to the standards articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). In either scenario the prisoner must also "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a

17

substantial one . . . [which] has some merit."

*Gill v. Atchison*, No. 11 C 7868, 2012 WL 2597873, at *4 (N.D. Ill. July 2, 2012) (Holderman, C.J.) (citations omitted). This court has previously described the application of that exception to prisoners convicted in Illinois state courts:

> This exception only applies in states where an initial-review collateral proceeding is the defendant's "first occasion to raise a claim of ineffective assistance at trial." *Martinez*, 132 S.Ct. at 1315, 1317. Illinois is not such a state. In Illinois, defendants may raise ineffective assistance of trial counsel claims on direct appeal if the "facts which form the basis for these contentions were contained in the trial record." *People v. Foster*, 168 Ill.2d 465, 214 Ill.Dec. 244, 660 N.E.2d 951, 958 (Ill. 1995). Moreover, if the trial record is incomplete to form the basis of an ineffective assistance of trial counsel claim, the defendant also has the ability to file a *Krankel* post-trial motion, pro se, to further develop the record on the issue prior to direct appeal. *People v. Krankel*, 102 Ill.2d 181, 80 Ill.Dec. 62, 464 N.E.2d 1045, 1049 (Ill. 1984); *see also People v. Moore*, 207 Ill.2d 68, 278 Ill.Dec. 36, 797 N.E.2d 631, 637 (Ill. 2003) (explaining that under *Krankel* "the trial court should first examine the factual basis of the defendant's claim . . . . if the allegations show possible neglect of the case, new counsel should be appointed."); *People v. Cummings*, 351 Ill.App.3d 343, 286 Ill.Dec. 311, 813 N.E.2d 1004, 1012 (Ill. App. Ct. 2004) (when *Krankel* is invoked trial courts must "afford the defendant an opportunity to specify and support his complaints").

*Id.* at *5. Accordingly, in Illinois "*Martinez* applies only where petitioner's first opportunity to raise an ineffectiveness claim is at an initial-review collateral proceeding." *Id.*

Here, Moore raises six ineffectiveness of trial counsel claims (claims 10, 11, 12, 13, 19, and 25) that are defaulted and potentially eligible for the *Martinez* exception. Five of those claims, however, were raised in Moore's successive post-conviction petition and rejected on the merits by the state trial judge.[6] Those five claims were then defaulted because Moore failed to present them

---

[6] Claim 10 was argued to the court beginning at R. at 3870, and was dismissed at R. at 3877. Claim 11 was argued at R. at 3872, and dismissed at R. at 3877. Claim 12 was argued at R. at

18

to the appellate court or to the Illinois Supreme Court on appeal of his successive post-conviction petition. The exception laid out in *Martinez*, however, does not apply to excuse defaults because of errors of post-conviction-appellate counsel. *Martinez*, 132 S. Ct. at 1320 ("The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts.").

The sixth ineffectiveness of trial counsel claim (claim 13) was not raised at any point in the state post-conviction proceedings. In claim 13, Moore contends that his trial counsel was ineffective at the sentencing stage for failing to object to hearsay testimony presented at sentencing by police Chief Terry Marketti that Moore threatened a Grundy County Sheriff Deputy. That evidence was presented in the capital sentencing hearing to show an aggravating factor relevant to the jury's decision about whether to sentence Moore to death. *See Moore*, 662 N.E.2d at 1232-33. In light of the commutation of Moore's sentence to life imprisonment, any allegations of error during his capital sentencing hearing are moot.[7]

---

3871, and dismissed at R. at 3877. Claim 19 was argued at R. at 3942, and dismissed at the close of the hearing. (*See* Dkt. No. 14, Ex. U, at 19 (docket entry of 3/16/1998).) Claim 25 was argued at R. at 3879, and dismissed at R. at 3881 and 3883.

[7] Even if the errors were not moot, claim 13 is not eligible for the *Martinez* exception because Moore cannot "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one . . . [which] has some merit." *Martinez*, 132 S. Ct. at 1318. The aggravating evidence presented at the capital sentencing hearing was overwhelming, even without Marketti's testimony, meaning that claim 13 does not satisfy the prejudice prong of *Strickland v. Washington*, 466 U.S. 668 (1984).

Moore thus cannot excuse any of the defaults of his claims.[8]

III.    Merits

The claims that Moore has properly preserved for federal habeas review are claims 5, 9, 16, 20, 23, 24, 27 (with respect to Moore's argument that the State's argument violated the presumption of innocence), 28, 30, and 32. When reviewing claims on the merits, the court will not disturb the decision of a state court unless Moore can show that the state proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1). "This is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (citations and quotation marks omitted).

The date of the state-court decision rejecting the petitioner's claim is relevant because "the phrase 'clearly established Federal law, as determined by [the Supreme] Court' refers to the

---

[8] Moore does not attempt to argue that his defaults will lead to a "fundamental miscarriage of justice," a standard requiring Moore to show his innocence by establishing that "in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 537 (2006) (citation and quotation marks omitted). The court does not discern any basis for such an argument from the record, nor is it the court's obligation to construct one. *See Buie v. McAdory*, 341 F.3d 623, 626-27 (7th Cir. 2003) ("A defendant who asserts actual innocence as a reason to excuse a procedural default must demonstrate innocence; the burden is his, not the state's, for the state has the benefit of the jury's verdict.").

holdings, as opposed to the dicta, of th[e Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 365 (2000) (citation omitted).

A.  Claim 9

Claim 9 contends that Moore's trial counsel, Thomas Royce, had a conflict of interest because he was paid by Moore's girlfriend, Tammy Saif, and had connections with the attorney representing Saif after she was charged with obstruction of justice for providing false information to the police regarding the charges against Moore. The Illinois Supreme Court rejected this argument on February 17, 2000, in its decision on Moore's initial post-conviction petition. *Moore*, 727 N.E.2d at 357-58. The court must thus determine if the Illinois Supreme Court reasonably applied the law clearly established by the U.S. Supreme Court by February 17, 2000.

Under that law, when, as here, the trial judge is not on notice of the potential conflict, a defendant raising the issue after trial must show "that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980); *see also Cabello v. United States*, 188 F.3d 871, 875 (7th Cir. 1999) (describing Supreme Court law at the time). The Illinois Supreme Court applied that law and concluded that Moore had not shown any conflict at all, citing an affidavit from Royce acknowledging that he had been paid with funds from Saif, but indicating that he understood he was retained to represent Moore. *Moore*, 727 N.E.2d at 357. The Illinois Supreme Court also cited the trial record, which indicated that Royce was surprised when Saif refused to testify by asserting her Fifth Amendment rights, thus disproving the theory that Royce was improperly coordinating his trial strategy with Saif. *Id.* at 357-58. The Illinois Supreme Court also noted that there was no evidence of an adverse effect on Royce's performance.

21

The only conceivable adverse effect was Royce's failure to call Saif as a witness, but that decision was the result of her invocation of the Fifth Amendment, not of Royce's trial strategy. *Id.* at 358.

Moore presents no argument that can overcome the Illinois Supreme Court's reasoning. Instead, Moore presents only evidence that was outside the record presented to the Illinois Supreme Court. This court may not consider that evidence. *See Pinholster*, 131 S. Ct. at 1398 ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). Moreover, under the Supreme Court's case law, the mere fact that an attorney is paid by a third party is insufficient to constitute a conflict of interest. *See Cabello*, 188 F.3d at 875. Accordingly, the Illinois Supreme Court's decision is a reasonable application of the U.S. Supreme Court's decisions.

B.     Claim 16

Claim 16 contends that Moore's trial counsel was ineffective for failing to move to suppress evidence that two hairs removed from the floor mat in Moore's car were consistent with the victim's hair, and that another heat-damaged hair was consistent with Moore's hair.[9] The Illinois Supreme Court considered and rejected this claim on direct appeal on January 18, 1996. *See Moore*, 662 N.E.2d at 1230-31.

To succeed on a claim for ineffective assistance of counsel the movant must show that: (1)

---

[9] Claim 16 also asserts that Moore's appellate post-conviction counsel was ineffective for failing to preserve the record with evidence he had related to the burnt hair. That claim is not cognizable under 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

the attorney's performance fell below an objective standard of reasonableness; and (2) this deficient performance resulted in prejudice to the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). If the movant fails to establish either of the two prongs above, the court's analysis may end without considering the other prong. *Id.* at 697.

Here, the Illinois Supreme Court rejected Moore's claim on the prejudice prong, noting that "even if the evidence had been suppressed, the outcome of the defendant's trial would not have changed." *Moore*, 662 N.E.2d at 1231. That holding, which Moore's argument does not address, was a reasonable application of the law. The forensic DNA evidence, Moore's possession of Zeman's jewelry, Moore's fingerprints on the adhesive side of the duct tape found on Zeman (indicating that he left them when using the duct tape) and on her car keys, and the other evidence are sufficient to convict Moore even if the evidence regarding the hairs had been suppressed.

C.      Claims 20, 30, and 32

Claims 20, 30, and 32 assert that Moore's post-conviction appellate counsel was ineffective and failed to provide reasonable assistance. Those claims are not cognizable under 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

D.      Claim 23

Claim 23 asserts that the trial court erred by not holding a *Frye* hearing regarding the admission of the FBI's DNA evidence, and by admitting that evidence at trial. The Illinois Supreme Court rejected that argument on direct appeal on January 18, 1996. *See Moore*, 662

23

N.E.2d at 1225-26.

Claim 23 raises an objection to the state court's evidentiary rulings based on state law.

Significantly, "state court evidentiary errors do not normally entitle a defendant to habeas relief."

*Anderson v. Sternes*, 243 F.3d 1049, 1053 (7th Cir. 2001). Instead,

> habeas relief is appropriate only if the erroneous evidentiary rulings were so prejudicial that they compromised the petitioner's due process right to a fundamentally fair trial. This means that the error must have produced a significant likelihood that an innocent person has been convicted. Indeed, because of this high standard, evidentiary questions are generally not subject to review in habeas corpus proceedings.

*Id.* (citation and alterations omitted). The error, if any does not rise to that level. Instead, as indicated above, the evidence of guilt at trial was overwhelming, even apart from the DNA evidence. Claim 23 fails.

### E.    Claim 24

Claim 24 raises the following argument:

> Edward Moore was denied due process and equal protection where after pleadings and argument had been concluded, the Illinois Supreme Court sua sponte heightened the pleading burden applicable to his cause of action for a new trial resulting from his ingestion [of] psychotropic drugs, conclu[d]ing that Mr. Moore failed to satisfy the new burden, and refused to give him an opportunity to replead his claim with fair notice of the law to be applied.

(Dkt. No. 1, at 49.) The Illinois Supreme Court decision about which Moore is complaining is its decision on the appeal of Moore's initial state post-conviction petition. *Moore*, 727 N.E.2d at 353-56.

At the time of Moore's trial, Illinois law provided that "[a] defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the

issue of his fitness while under medication." *See* 725 ILCS 5/104-21(a) (1992). Moore argued in his initial state post-conviction petition that he was denied due process because he was ingesting psychotropic drugs at the time of trial, but was denied a hearing under § 104-21(a). *Moore*, 727 N.E.2d at 353-55. In addition, he contended that his trial counsel was ineffective for failing to request a fitness hearing. *Id.* at 355-56.

At the time Moore filed his initial state post-conviction petition, Illinois law provided that the failure to comply with § 104-21(a) is a violation of the U.S. Constitution entitling a state habeas petitioner to relief, regardless of whether the petitioner was able to show his lack of fitness at the § 104-21(a) hearing. *People v. Nitz*, 670 N.E.2d 672, 676 (Ill. 1996). Illinois law also provided that a petitioner can satisfy the prejudice prong of the *Strickland v. Washington* inquiry merely by showing that he was entitled to a § 104-21(a) hearing that his counsel failed to request, again regardless of whether the petitioner was able to show lack of fitness. *People v. Brandon*, 643 N.E.2d 712, 716 (Ill. 1994). Moore contends that, in reliance on those precedents, he did not allege facts in his initial post-conviction hearing sufficient to show that he was unfit to stand trial.

After the Illinois trial court rejected Moore's initial post-conviction petition, and a few weeks before the Illinois Supreme Court ruled on the appeal of that petition, Illinois law changed in *People v. Mitchell*, 727 N.E.2d 254 (Ill. 2000). Specifically, the Illinois Supreme Court held in *Mitchell* that to succeed on either a due process or ineffectiveness of counsel claim, a petitioner must show that he was actually unfit to stand trial to secure any relief when a § 104-21(a) hearing is improperly denied. *Id.* at 263-68.

The Illinois Supreme Court relied on the new law in *Mitchell* to reject Moore's appeal of

25

his initial post-conviction petition, holding that Moore's failure to allege facts indicating that he was unfit to stand trial doomed his due process and ineffective assistance of counsel claims. *Moore*, 727 N.E.2d at 353-56. On a request for rehearing, the Illinois Supreme Court denied Moore's request for a remand to the trial court to allow him to amend his allegations. *Id.* at 362.

Moore now contends that the application of *Mitchell* without granting him the right to amend his initial post-conviction petition was a denial of due process. There are two problems with that argument. First, Moore has not raised that due process argument through one complete round of state review (as he could have done in his successive state post-conviction petition), so it is itself defaulted under 28 U.S.C. § 2254(b).[10]

Second, even if the argument were not defaulted, a due process claim regarding "errors in state collateral review cannot form the basis for federal habeas corpus relief." *Montgomery v. Meloy*, 90 F.3d 1200, 1206 (7th Cir. 1996) (declining to provide relief on petitioner's claim that delay in adjudication of prisoner's state post-conviction petition violated the due process clause because "[n]o constitutional provision or federal law entitles [a prisoner] to any state collateral review"); *but see St. Pierre v. Cowan*, 217 F.3d 939, 949 (7th Cir. 2000) ("Obviously, the state has no obligation to provide appellate or post-conviction remedies, but if it has chosen to do so, due process principles apply to the terms on which these remedies must be furnished or lost."). The

---

[10] Note that the due process argument Moore raises now is distinct from the arguments that Moore was denied due process because he was tried and convicted while unfit for trial, and that Moore was denied effective assistance of counsel because his trial counsel failed to request a § 104-21(a) hearing, both of which were raised in the state courts. Moore does not raise those arguments in his § 2254 petition, so the court need not address them.

only exception to that rule is where "state collateral review violates some independent constitutional right, such as the Equal Protection Clause." *Montgomery*, 90 F.3d at 1206.

Here, Moore's § 2254 petition mentions an equal protection claim, but does not elaborate at all on how the Illinois procedures violated it. The Seventh Circuit has already addressed a similar situation, holding that a petitioner failed to raise an equal protection claim when the petitioner's "undeveloped equal protection argument consists of nothing more than [the] inclusion of the words "and equal protection" after the words "due process" in a few inconspicuous places within his Memorandum of Law in Support." *Jackson v. Duckworth*, 112 F.3d 878, 880 (7th Cir. 1997). Following *Jackson*, this court holds that Moore cannot challenge the Illinois Supreme Court's procedures in relying on *Mitchell* in his federal habeas petition. *See also Evans v. Leibach*, No. 03 C 2320, 2003 WL 21730116, at *3 n.2 (N.D. Ill. July 18, 2003) (Aspen, J.) ("Because state law established the due process and equal protection rights Evans claims were violated, they are not cognizable under federal habeas review.").

F.     Claim 27

The preserved portion of claim 27 alleges that the State improperly commented on Moore's failure to testify when it repeatedly commented in closing argument about "uncontradicted" testimony. The State's allegedly offending argument is as follows:

> [Moore] told [cellmate] Irwin that he taped Judy's eyes and wrists. That he stole her money and jewelry. And that he set her on fire. He confessed. Irwin Johnson didn't know anything about this case. He didn't know about tape or fire or jewelry. This man knew about that. Uncontradicted, uncontroverted. He confessed.

As the Illinois Supreme Court noted, Moore's attorney objected to this testimony, the judge sustained the objection, and the judge gave the jury a limiting instruction that "the defendant in this

27

case is presumed innocent. The State must prove the defendant guilty beyond a reasonable doubt. The defendant does not have to produce evidence to prove his innocence." *Moore*, 662 N.E.2d at 1229. The Illinois Supreme Court reasoned that the limiting instruction was sufficient to cure any error. *Id.* That decision was a reasonable application of Supreme Court law, *see, e.g.*, *United States v. Lane*, 474 U.S. 438, 450 (1986), so Moore is not entitled to relief.

        G.     Claims 5 and 28

Claims 5 and 28 contend that the state courts erred by denying Moore's motion for DNA testing pursuant to 725 ILCS 5/116-3, and that testing of certain physical evidence in the State's possession would show that Moore is actually innocent of the crime. The Illinois Appellate Court's opinion affirming the denial of Moore's motion is Exhibit I of docket entry number 14.

Moore has no freestanding constitutional right to post-conviction DNA testing. *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 73 (2009). The only argument related to his motion for DNA testing that he may advance on a habeas petition is the argument that "consideration of [his] claim within the framework of the State's procedures for postconviction relief offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or transgresses any recognized principle of fundamental fairness in operation." *Id.* at 69 (citations and quotation marks omitted). Moore does not contend that the State's procedures under 725 ILCS 5/116-3 are inadequate, or that they were applied to him in an unconstitutional fashion. Moore's claims fail.

IV.    Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Proceedings for the United

States District Courts, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To be entitled to the issuance of a certificate of appealability, the movant must have made a "substantial showing of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). This standard requires the movant to "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* at 484. The arguments expressed in Moore's § 2254 petition are either procedurally defaulted or lack merit. Consequently, this court finds that its resolution of Moore's claims is not debatable among reasonable jurists. The court denies Moore a certificate of appealability.

<u>CONCLUSION</u>

For the reasons explained above, Moore's petition for relief under 28 U.S.C. § 2254 (Dkt. No. 1.) is denied. Moore's request for a certificate of appealability is denied with respect to all of his claims. Civil Case Terminated.

ENTER:

_James F. Holderman_____

JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: April 29, 2013

29